UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| VICKY L. MUCKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14 CV 1343JMB |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves an Application for Disability Insurance Benefits under Title II of the Social

Security Act. Plaintiff has filed a Brief in Support of her Complaint, and the Commissioner has

filed a Brief in Support of her Answer. The parties consented to the jurisdiction of the

undersigned pursuant to 28 U.S.C. § 636(c).

**I.      Procedural History**

On March 5, 2010, Plaintiff Vicky L. Muckey filed an Application for Disability

Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 114-21)[1] Plaintiff

states that her disability began on February 25, 2009, as a result of ADHD and bipolar disorder.

On initial consideration, the Social Security Administration denied Plaintiff's claims for benefits.

(Tr. 55-59) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). On May

5, 2011, a hearing was held before an ALJ. (Tr. 25-49) Plaintiff testified and was represented by

_____

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer
(Docket No. 12/filed September 30, 2014).

counsel.  (Id.)  Vocational Expert Dr. Gerald Belchick, Ph.D., also testified at the hearing.  (Tr. 39-45, 106-07)  Thereafter, on July 13, 2011, the ALJ issued a decision denying Plaintiff's claims for benefits.  (Tr. 11-19)  On October 25, 2012, the Appeals Council found no basis for changing the ALJ's decision and denied her request for review.  (Tr. 7-9)  On June 27, 2014, the Appeals Council, after setting aside its October 25, 2012, decision, denied her request for review a second time.  (Tr. 1-6, 217-19)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

### A.  Hearing on May 5, 2011

#### 1. Plaintiff's Testimony

At the hearing on May 5, 2011, Plaintiff testified in response to questions posed by the ALJ and counsel.  (Tr. 28-39)  She lives with her husband in Festus.  (Tr. 28)  Plaintiff has a GED and additional training as a bookkeeper from Sanford Brown College, and as a dispatcher, from Abbott Ambulance.  (Tr. 29)

Plaintiff acknowledged the medical records show she helped her niece from September through December 2009, by answering the phones at her office.  (Tr. 30)  Plaintiff stated she possibly stopped receiving unemployment benefits is 2010.  (Id.)  The ALJ directed counsel to contact the unemployment office and find out when her benefits started and ceased.  (Tr. 31)  Plaintiff testified that during that time period she looked for secretarial jobs.  (Id.)

Plaintiff testified that Dr. Malik of Psych Care Consultants has treated her for almost a year, and Dr. Malik provides medication management to her.  (Tr. 33)  She testified that Dr. Malik treats her for anxiety, bipolar disorder, and depression.  (Tr. 34)  During treatment, she complained of memory problems.  (Tr. 38)  Plaintiff testified that she cannot afford the $50

deductible to see the doctor.  (Tr. 33)  As a child, Plaintiff was treated for ADHD, and her treating doctor diagnosed her with ADHD.  (Tr. 39)

Plaintiff testified she takes her medications when she remembers, but she admitted she does not take her medications consistently.  (Tr. 35)  Plaintiff explained how, when she forgot to take her medications for a couple of days, her husband questioned whether she had been taking her medications based on her behavior.  (Tr. 36)  Plaintiff testified that her doctor does not know she is not taking her medications consistently.  (Id.)  The only side effect from her medications is weight gain.  (Tr. 37)

As to her daily activities, Plaintiff testified that she has not done much since 2009, because she feels down.  (Tr. 35-36)  She forgets appointments and birthdays.  (Tr. 38)  Plaintiff stopped working on February 25, 2009, her alleged onset date of disability, after she was fired for frequently missing work.  (Tr. 34)

## 2.  Testimony of Vocational Expert

Vocational Expert Dr. Gerald Belchick testified at the hearing.  (Tr. 39-46)  The ALJ noted the records and Plaintiff's testimony show she has work experience as an ambulance dispatcher, a cashier, a bookkeeper, and a receptionist/secretary.  (Tr. 41)  Dr. Belchick noted that Plaintiff worked as receptionist from 1995 through 1997, a semi-skilled job considered sedentary.  (Tr. 42)  From 1998 through 2001, she worked as a bookkeeper, a skilled job considered sedentary.  Dr. Belchick noted that Plaintiff next worked as a cashier in a retail setting from 2001 through 2005, a semi-skilled job considered light.  From 2005 through 2009, Plaintiff worked as a dispatcher for an ambulance service, a semi-skilled job considered sedentary.  (Id.)

The ALJ noted that, although the medical records and her hearing testimony do not show Plaintiff has any physical limitations, she does have non-exertional limitations related to her mental impairments. (Tr. 42-43) Specifically, the ALJ opined Plaintiff is limited to unskilled work, and she is precluded from working in a setting which requires constant regular contact with the general public or more than infrequent handling of customer complaints. (Tr. 43) When asked whether Plaintiff could perform any of her past relevant work with those limitations, Dr. Belchick testified that all of her past relevant work would be eliminated, and there would be no transferable skills. (Id.)

Next the ALJ asked "whether a hypothetical individual with the same educational background, vocational profile, and residual functional capacity has the ability to perform any occupations that exist in significant numbers on a regional and national level?" (Tr. 43) Dr. Belchick first identified an unskilled job of assembling that can be performed at either the sedentary, light or medium exertional level. (Tr. 44) At the light level, Dr. Belchick indicated there are 3,100 jobs locally, and nationally 400,000 jobs available. Next, Dr. Belchick identified another unskilled job of packaging that can be performed at either the sedentary or light level, with 2,400 jobs in the local area and about 245,000 jobs nationally. The third unskilled job he identified was a kitchen helper with duties including mostly dishwashing, with a light level and 3,500 jobs available locally and about120,000 nationally. (Id.)

Plaintiff's counsel asked Dr. Belchick whether a hypothetical individual who had marked limitations in her ability to accept instruction and respond appropriately to supervisors in the work place would be able perform any of the jobs he listed. (Tr. 45) Dr. Belchick noted how marked limitations by definition would preclude the ability to perform the jobs. Next, counsel asked if the individual missed more than three days of work per month as a regular occurrence,

4

would she be able to perform any of the jobs he listed.  Dr. Belchick explained the national

average is one day a month, and so absences in excess of one day a month would eliminate the

jobs he cited.  (Id.)

In a post hearing addendum to the record, the ALJ opined as follows:

The claimant's medical records are replete with instances of her non-compliance
regarding her medication.  I also note to[sic] that for most of her medical records
she saw like Dr. Polite[sic] ..., saw him only once basically there for an evaluation
and that was it.  That Dr. Data[sic], there basically for an evaluation and then I
think she saw him once or twice after that and that was the end of that.  She's now
with Dr. Malick[sic], according to the medical records that I have so far, she's
seen Dr. Malick[sic] once.  Dr. Polite[sic] diagnosed the claimant with ADHD,
nothing else, no depression, no anxiety, just ADHD basically at the suggestion of
the claimant and began treating her for that.  As I stated before, she dropped him
and then moved on to Dr. Data[sic], also went to several people at Psych Care
Consultants.  As I stated before, she's now with Dr. Malick[sic], who is treating
her only for bipolar, a panic disorder NOS.  There's no indication that the
claimant is being treated for depression other than bipolar symptoms.  Dr.
Malick[sic] gave the claimant a GAF of between 60 and 70.  And that was by a
letter dated May 17, 2010.  Per the claimant's own testimony, she is extremely
non-complaint and has not told her doctors such, so they're assuming that she's
complaint with her medications and yet she continues to suffer all these
symptoms.  They are obviously not aware of the fact that these are symptoms
being reported by the claimant who is not taking her medication.  However, I will
specifically note that in the decision.  The claimant received unemployment
benefits after she was fired and was out looking for secretarial jobs despite her
testimony that she was just sitting around all day long and not doing anything.  Up
until recently, the claimant was also babysitting her incredibly young grandchild
who as of 2010 was only two years old.  And then between September and
November of 2009, the claimant was acting as a telephone receptionist for her
cousin who was starting a business.  Although counsel provided, you know,
question Dr. Belcheck[sic] regarding additional limitations due to the claimant's
mental impairment, the bottom line is that the claimant would improve and
according to her own testimony her husband has said that there would be
improvement, she would be better if she were taking her medication.  So my
limitations that I have given Dr. Belcheck[sic] are based on the fact that the
claimant would actually be compliant with her medication.  Because of the
inconsistency regarding her activities of daily living and what is in the medical
records, I still believe that she can perform the limitations that I gave Dr.
Belcheck[sic] despite the fact that she's not taking her meds.  Any assessment that
the doctors have done in the records need to be considered along with the fact that
the claimant has not been telling them that she is non-compliant.  They're making

assessments based on what they think the claimant's mental capacity is while being compliant with the medication and clearly that's not true.
(Tr. 46-49)

### 3. Forms Completed by Plaintiff

In the Disability Report - Adult, Plaintiff reported she stopped working because of her conditions and other reasons, mainly she was fired due to her attendance. (Tr. 183-85) She listed in her job history the following jobs: dispatcher, cashier, bookkeeper, and receptionist. (Tr. 186)

In her Function Report - Adult, Plaintiff reported her daily activities include eating breakfast, watching television, hanging around the house, sometimes doing her laundry, making lunch, and sometimes making dinner. (Tr. 172) Sometimes she visits family or friends, and she goes shopping as needed. (Id.)

## III. Medical Records[2] and Other Records

To obtain disability insurance benefits, Claimant must establish that she was disabled within the meaning of the Social Security Act not later than the date her insured status expired - June 30, 2014. Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) ("In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status."); see also 42 U.S.C. §§ 416(I) and 423(c); 20 C.F.R. § 404.131.

On August 8, 2008, Plaintiff presented at Kirkwood Medical Group for preventive medicine treatment and reported having anxiety. (Tr. 264) The neuro/psychiatric examination was negative for appropriate interaction, combativeness, and difficulty concentrating. (Tr. 265) Dr. Singer found her memory to be intact. (Id.) Plaintiff returned on September 10, 2008,

---

[2]Although the Court has carefully reviewed all of the medical evidence, only medical records relevant to the ALJ's decision and Plaintiff's challenges to the ALJ's decision are discussed.

complaining of depression. (Tr. 262) Dr. Singer noted she had a depressed affect. (Tr. 263) She did not report any memory loss. (Id.)

In follow-up treatment on January 16, 2009, Dr. Singer noted Plaintiff has psychiatric symptoms including anxiety and difficulty concentrating. (Tr. 260, 352) Psychiatric examination showed she has a normal attention span and concentration. (Tr. 261) Dr. Singer prescribed Concerta. (Id.) On February 5, 2009, Dr. Singer noted Plaintiff was negative for psychiatric symptoms. (Tr. 258, 354) On October 9, 2009, Plaintiff presented with ADD and reported symptoms of inattentive, short attention span, impulsiveness, and distracted easily. (Tr. 253, 358) Dr. Singer found she has difficulty concentrating, and her affect to be normal, and her symptoms were relieved by stimulant medications. (Tr. 255, 359) Dr. Singer noted Plaintiff does not have memory loss and has normal insight and judgment, but she has poor attention span and concentration. Dr. Singer prescribed Concerta and started a trial of dietary and behavioral modification. (Id.) On November 6, 2009, Plaintiff reported she was not responding to current treatment, and Dr. Singer increased her Concerta dosage and referred her to a psychiatrist for treatment. (Tr. 252, 361)

On referral by Dr. Singer, Dr. Alan Politte completed a psychological evaluation on September 1 and 17, 2009, and diagnosed Plaintiff with ADHD. (Tr. 220-29, 377-85) Plaintiff reported being diagnosed with ADD as a child and taking Ritalin, but she stopped taking ADD medication some time ago. (Tr. 221, 378) After reading a book on ADD, she decided she still has ADD, and she believes ADD is causing most of her problems. After seeing Dr. Singer, her primary care physician who prescribed an antidepressant, Plaintiff reported how she decided not to take the medication. (Id.) Her husband noted he thinks Plaintiff is antisocial and has problems with concentration. (Tr. 222, 379) Plaintiff reported being capable of handling

cooking, cleaning, and laundry.  She is involved in her church.  (Id.)  At the time of the

evaluation, Plaintiff was not taking any medications.  (Tr. 223, 380)  Although Plaintiff reported

not being employed, she said that she helps her niece with some projects.  Dr. Politte observed

Plaintiff to be cooperative and worked quickly on the evaluative tests.  (Id.)  The testing showed

she has a full scale IQ of 92, evidencing functioning at the average intellectual range.  (Tr. 224,

381)  Dr. Politte interpreted the test results to evidence Plaintiff having difficulty with

interpersonal relationships with her coworkers, husband, and family.  (Tr. 226, 382)  Dr. Politte

found she has moderate to severe difficulties being compliant.  (Tr. 227, 383)  The various

projective tests indicated that she has a poor self-image and feelings of inadequacy, as well as a

sense of insecurity.  (Tr. 228, 384)  Dr. Politte noted she deals with her feelings by acting out in

frustration and anger against anyone who comes in her view.  (Id.)  Based on the testing, Dr.

Politte diagnosed her with Attention Deficit/Hyperactivity Disorder and a number of antisocial

personality characteristics.  (Tr. 228-29, 384-85)

On November 17, 2009, Plaintiff started treatment with Dr. Gautum Datta of Psych Care

Consultants.  (Tr. 305)  Plaintiff noted her current psychosocial stressors to be her husband and

lack of medications.  Dr. Datta diagnosed ADD, ruled out bipolar affective disorder, and

prescribed Xanax, Dilantin, and Seroquel[3]  (Id.)[4]  In follow-up treatment on November 23 and

December 7, 2009, Dr. Datta continued her medication regimen and noted how Xanax helped

Plaintiff's anxiety, and her condition was much better.  (Tr. 311-14)  On December 21, 2009,

Plaintiff reported no psychiatric symptomology, but she was having marital problems.  (Tr. 316,

_____

[3]Seroquel is used to treat symptoms of schizophrenia, bipolar disorder, and depression.
*Medline Plus,* http://www.nlm.nih.gov/medlineplus/druginfo/meds/.html.
    [4]The Court finds the treatment notes dated November 17 and 23, 2009 and December 7, 2009,
in Exhibit 6F almost completely illegible. (Tr. 305-15)

347) Monitoring Plaintiff's compliance and medications was the treatment plan, and she was given materials on anxiety and self-esteem. (Tr. 317, 349) Plaintiff requested a refill of Xanax on January 11, 2010. (Tr. 319) Plaintiff reported being fired in February, 2009, and her spouse wanting her to get a job. In follow-up treatment on February 11, 2010, she reported having no agitation or psychotic symptoms. (Tr. 321, 350) Plaintiff explained how she had to stop going to church, because her husband might meet other women at church. Monitoring her compliance and medications was the treatment plan. (Id.)

In a March 31, 2010, Psych Care Consultants treatment note, Plaintiff stated she is unhappy in her marriage and having a lot of anger and high anxiety. (Tr. 324, 363) Plaintiff reported that Dr. Datta had been treating her for ADD and prescribed Ritalin and Adderall. Dr. Malik found Plaintiff endorsed symptoms of bipolar disorder. (Id.) Her current medications included Xanax and Adderall. (Tr. 326, 365) A GAF score of 60 was assigned. With respect to her memory, Dr. Malik checked both her recent and remote and noted she has decreased concentration and fair insight/judgment. Dr. Malik made the diagnosis of bipolar disorder. (Id.)[5] In follow-up treatment on April 14, she complained of being sad, angry, and irritable. (Tr. 327, 366) Dr. Malik prescribed Abilify. (Id.) During treatment on May 15, Plaintiff received

---

[5]The Global Assessment of Functioning Scale ("GAF") is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), 32 (4th ed. 1994). A GAF score between 51 and 60 indicates moderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). A GAF score between 61 and 70 indicates some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV 32.

medication refills.  (Tr. 367)[6]  She reported being denied SSI and feeling angry, depressed, and down.  (Tr. 367-68)

Completing a Mental Residual Functional Capacity Assessment dated May 6, 2010, Dr. James Morgan concluded that, in the three abilities in the area of understanding and memory, Plaintiff was not significantly limited.  (Tr. 328)  In the area of sustained concentration and persistence, she was not significantly limited in five of the seven abilities: namely her abilities to (i) to carry out very short and simple instructions; (ii) to carry out detailed instructions; (iii) to maintain attention and concentration for extended periods; (iv) to sustain an ordinary routine without special supervision; and (v) to make simple work-related decisions.  Plaintiff was moderately limited in the remaining two abilities: namely, (i) her abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (ii)  to work in coordination with or proximity to others without being distracted by them.  (Tr. 328-29)  In the area of social interaction, Plaintiff was not significantly limited in one of the five abilities, i.e., her ability to ask simple questions or request assistance, and was moderately limited in three, namely her abilities to (i) interact appropriately with the general public; (ii) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (iii) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  Plaintiff was markedly limited in her ability to accept instructions and respond appropriately to criticism from supervisors.  (Tr. 329)  In the area of adaptation, she was not significantly limited in three of four abilities listed, namely her abilities to (i) to be aware of normal hazards and take appropriate precautions; (ii) travel in unfamiliar places or use public

_____

[6]The Court finds the treatment notes dated June 4, 2010, in Exhibit 15F to be completely illegible.  (Tr. 367-68).

transportation; and (iii) set realistic goals or make plans independently of others. Plaintiff was moderately limited in one, i.e., to respond appropriately to changes in the work setting. (Id.) Dr. Morgan opined that the totality of the evidence supports her ability to work away from the public. (Tr. 330)

Also in May 2010, Dr. Morgan completed a Psychiatric Review Technique and noted Plaintiff has an organic mental disorder, ADD, an affective disorder, bipolar, and a personality disorder, but the medical evidence record shows her alleged severity appears to be partially credible, and she has the ability to work away from the public. (Tr. 331-41) In particular, Dr. Morgan found Plaintiff to be markedly limited in maintaining social functioning. (Tr. 339)

In a May 17, 2010, "To Whom it May Concern Letter" sent to the Department of Disability, Dr. Malik stated Plaintiff has been under her care since March 31, 2010, and has a GAF assessment of 60/70. (Tr. 346) Dr. Malik opined "[b]ecause of her mental illness, she has not been able to maintain gainful employment." (Id.)

In follow-up treatment on June 4, 2010, with Dr. Malik, although she noted not being as moody or angry, Plaintiff explained how when people upset her, "she goes off on people." (Tr. 368-69) Dr. Malik found she still had depressive symptoms, but her anxiety had improved. (Tr. 368) Plaintiff stated people told her she is calmer, but she still gets agitated with people. (Tr. 369) Dr. Malik increased her Abilify dosage and added Lithobid. (Id.) On June 8 her appointment was cancelled, because she was late. (Id.) On August 4 and 23, 2010, she reported not being as agitated and not experiencing any side effects from Abilify, but she still felt depressed. (Tr. 368-70) Her anxiety had lessened. (Id.) During treatment on September 24, 2010, Plaintiff denied having psychotic symptoms and side effects from medications. (Tr. 371) She reported that she walked up to three miles a day. Dr. Malik continued her medication

regimen.  On November 3, 2010, she reported not feeling depressed all the time.  Plaintiff denied having psychotic symptoms and side effects from medications.  Although she was getting along better with her husband, Plaintiff was still suspicious of him, because he was not being affectionate anymore.  (Id.)  Dr. Malik continued her medication regimen.  (Tr. 372)

Dr. Malik completed a Mental Health Source Document - Depression and/or Anxiety in a check-box format on August 4, 2010.  (Tr. 389)  Dr. Malik opined Plaintiff would have marked limitations in her ability to deal with work stress.  Her psychological conditions affecting her ability to work are anxiety and mood disorder.  Dr. Malik noted her symptoms would frequently limit her ability to handle work demands, persistence, and expectations and to focus, organize, and complete work tasks timely.  Dr. Malik checked off crying spells, loss of energy, fatigue, loss of interest in activities, sleep disturbance, difficulty with memory and concentration, reduced social function, restriction in daily activities, mental and physical exhaustion, always feels stress, feelings of loss of control, and reduced social life as depressive symptoms present.  Dr. Malik noted that she first treated Plaintiff on March 31, 2010.  (Id.)

During treatment on December 13, 2010, Plaintiff reported her mood to be better and improvement in sleep, but she is crying over little things.  (Tr. 397)  Dr. Malik increased her dosage of Lithobid and added Celexa to address her depressive symptoms.  (Tr. 397-98)  In follow-up treatment on February 7, 2011, Plaintiff noted how she is feeling better, but occasionally she feels down so she gets up and does things.  (Tr. 398)  Since starting the two medications, her relationship with her husband has improved, and she is not irritable or having crying spells.  She still experiences a little anxiety, but her anxiety is not as bad as it used to be. Plaintiff reported Celexa having helped.  (Id.)  Dr. Malik continued her medication regimen of Abilify, Lithobid, and Celexa.  (Tr. 399)  On April 4, Plaintiff complained of feeling down for

the last two weeks but getting along better with her husband.  (<u>Id.</u>)  She denied having symptoms of psychosis.  (Tr. 400)  Dr. Malik formulated an exercise plan and continued her medication regimen.  (<u>Id.</u>)

In the June 6, 2011, "To Whom it May Concern Letter" sent to her attorney's office, Dr. Malik noted how Plaintiff is currently a patient under her care being treated for bipolar disorder, anxiety, and depressive symptoms.  (Tr. 401)  She prescribes Abilify, Lithobid, and Celexa.  Dr. Malik noted how "her illness causes her problems with her concentration and memory," and "she has difficulty remembering to take her medications."  (<u>Id.</u>)

## IV.    The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act on February 25, 2009, and she has remained insured throughout the period of the decision. (Tr. 16)  Plaintiff has not engaged in substantial gainful activity since February 25, 2009. The ALJ found Plaintiff has the severe impairments of bipolar disorder and attention deficit hyperactivity disorder, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  The ALJ found that since February 25, 2009, Plaintiff has the residual functional capacity to perform work at all exertional levels, and she has the ability to understand, remember and carry out at least simple instructions and non-detailed tasks.  The ALJ imposed the limitations that Plaintiff's work must not require constant or regular contact with the general public or more than infrequent handling of customer complaints.  (<u>Id.</u>)  The ALJ found Plaintiff is unable to perform any past relevant work.  (Tr. 18) Plaintiff has the equivalent of a high school education plus college-work as a bookkeeper and four months training as a dispatcher.  The ALJ found that, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs existing in significant numbers

13

in the national economy she could have performed including an assembler, a packager, and a kitchen helper.  (Id.)  The ALJ concluded Plaintiff has not been disabled within the meaning of the Social Security Act at any time from February 25, 2009, the alleged onset date, through the date of the decision.  (Tr. 19)

## V.     Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, she is not eligible for disability benefits.

If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the claimant's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Plaintiff argues that the ALJ failed to give the proper weight to the opinion of her treating physician, Dr. Shazia Malik.[7]  Here, the ALJ accorded Dr. Malik's opinions slight weight, finding them inconsistent with her own treatment notes and the medical record as a whole.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'"  Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original)).  When a treating

_____

[7]Although the government addressed in its Brief how substantial evidence supports the ALJ's adverse credibility determination, the undersigned will not do so in light of Plaintiff not taking issue with the ALJ's adverse credibility determination.  Moreover, the Court finds the ALJ complied with the strictures of Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), and there is substantial evidence in the record to support the ALJ's analysis of Plaintiff's credibility.  A review of the ALJ's decision shows she discredited Plaintiff's subjective complaints for good reason and thoroughly discussed the medical evidence of record and inconsistencies in the record in support of her adverse credibility determination.

physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010). "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)). The ALJ is charged with the responsibility of resolving conflicts among the medical opinions. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

The undersigned finds that the ALJ considered Dr. Malik's opinions set forth in the one-page attorney-commissioned Mental Health Source Document - Depression and/or Anxiety and gave little weight to Dr. Malik's opinions in her written opinion as follows:

> [T]hese opinions are given slight weight for several reasons. First, they are inconsistent with the record as a whole. Second, they are inconsistent with ... Dr. Malik's assessments of a mild to moderate impairment.... Third, per the claimant's testimony, the doctor is unaware that she does not always take her medication as prescribed.

(Tr. 17) (internal citation omitted)

In the Mental Health Source Document - Depression and/or Anxiety ("Source Document"), completed on August 4, 2010, Dr. Malik opined Plaintiff would have marked limitations in her ability to deal with work stress, and her anxiety and mood disorder affected her ability to work. Dr. Malik also noted Plaintiff's symptoms would frequently limit her ability to handle work demands, persistence, and expectations and to focus, organize, and timely complete work tasks. Dr. Malik checked off crying spells, loss of energy, fatigue, loss of interest in activities, sleep disturbance, difficulty with memory and concentration, reduced social function,

restriction in daily activities, mental and physical exhaustion, always feels stress, feelings of loss

of control, and reduced social life as depressive her symptoms. In the May 17, 2010, "To Whom

it May Concern Letter" sent to the Department of Disability, Dr. Malik indicated Plaintiff had a

GAF assessment of 60/70 and opined "[b]ecause of her mental illness, she has not been able to

maintain gainful employment."[8]

       In the instant case, the record includes a treatment note of a visit to Dr. Malik on the day

she completed the Source Document. The Source Document was only a series of check marks to

assess the mental limitations of Plaintiff with little or no explanation of the findings. A checklist

format and conclusory opinions, even of a treating physician, are of limited evidentiary value.

Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010). In Wildman, the Eighth Circuit held that

the ALJ had properly discounted a treating physician's assessment as conclusory when that

"opinion consist[ed] of three checklist forms, cite[d] no medical evidence, and provide[d] little to

no elaboration." 596 F.3d at 964. See also Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir.

2001) ("The checklist format, generality, and incompleteness of the [RFC] assessments limit

their evidentiary value."). Further, the Source Document appears to have been procured by, and

submitted to, Plaintiff's counsel. The Source Document does not refer to any clinical tests or

findings, and as noted below, was inconsistent with Dr. Malik's prior treatment notes, as well as

the treatment note from the same day wherein Plaintiff did not report the conditions and

---

[8]    First, to the extent Dr. Malik opined that Plaintiff is disabled and incapable of performing any competitive employment, a treating physician's opinion that a claimant is not able to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," because it invades the province of the Commissioner to make the ultimate determination of disability).

symptoms that she claims render her totally disabled.  Accordingly, the ALJ was justified in giving less than controlling weight to the conclusory opinions set forth in Dr. Malik's Source Document.

With respect to the alleged inability to concentrate and difficulty with memory, the ALJ found Dr. Malik's opinion was inconsistent with her own treatment notes inasmuch as she never found such limitations during treatment.  Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009). A review of the instant medical record shows Dr. Malik's opinions are not supported by her treatment notes and are conclusory.  See McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011) (rejecting claimant's challenge to lack of weight given treating physician's evaluation of claimant's mental impairments when "evaluation appeared to be based, at least in part, on [claimant's] self-reported symptoms, and, thus, insofar as those reported symptoms were found to be less than credible, [the treating physician's] report was rendered less credible.").  On May 17, 2010, Dr. Malik noted Plaintiff had a GAF assessment of 60/70, suggesting she had no more than mild to moderate limitations.  Dr. Malik's treatment notes do not reflect the degree of limitation she noted in her August 4, 2010, Source Document.  Dr. Malik's opinion was internally inconsistent as she assigned a GAF score that supported only moderate symptoms, but she imposed extreme work-related limitations in the Source Document.

Further, a review of Dr. Malik's treatment notes show she never imposed any mental limitations or any work restrictions on Plaintiff.  See Fischer v. Barnhart, 56 F. App'x 746, 748 (8th Cir. 2003) ("in discounting [the treating physician's] opinion, the ALJ properly noted that ... [the treating physician] had never recommended any work restrictions for [the claimant]").  The relevant lack of supporting evidence includes the absence of any restrictions placed on her by Dr. Malik during her treatment of Plaintiff.  See Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011).

In follow-up treatment on February 7, 2011, Plaintiff reported feeling better and not being irritable, and her relationship with her husband improving since she started taking the two medications. The undersigned concludes that the ALJ did not err in affording little weight to Dr. Malik's opinions of August, 2010.

Lastly, Dr. Malik's opinions were inconsistent with other substantial medical evidence. The evaluation of Plaintiff's mental status by Drs. Politte and Datta failed to evidence any deficits or abnormalities other than a poor self image, feelings of insecurity, and on occasion, abnormal affect, decreased concentration, low energy, and/or disturbed sleep. The January 16, 2009 psychiatric examination by Dr. Singer showed Plaintiff had a normal attention span and concentration. Moreover, the assessments of Plaintiff's GAF ranged from 70 to 55 during the relevant time period. The ALJ properly accorded Dr. Malik's opinions in the Source Document little weight inasmuch as her findings were inconsistent with, and unsupported by, the evidence of record. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.") (citation and internal quotation omitted).

Further, no examining physician in any treatment notes stated that Plaintiff was disabled or unable to work or imposed mental limitations on Claimant's capacity for work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The absence of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012);

Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). Thus, the ALJ did not err in giving slight weight to Dr. Malik's opinions set forth in the Source Document. Renstrom, 680 F.3d at 1065 (ALJ properly gave treating physician's opinion non-controlling weight when that opinion was largely based on claimant's subjective complaints and was inconsistent with other medical experts). As such, the undersigned finds that the ALJ gave proper weight to Dr. Malik's opinions.

## VI.    Conclusion

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. An ALJ's decision is not to be disturbed "'so long as the ... decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above. Accordingly, the decision of the ALJ denying Plaintiff's claims for benefits should be affirmed.

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.  A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this __18th__ day of June, 2015.

/s/ John M. Bodenhausen
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE